## HUNT vs. MOOTRIE.

*In the matter of proving the last Will and Testament of* BENJAMIN F. HUNT, *deceased.*

WHEN the decedent failed to declare to the subscribing witnesses that the paper which they were called to attest was his last will and testament, but simply acknowledged his signature, and requested them to sign at a particular place pointed out by him.—*Held*, that this was not a valid testamentary declaration.

The knowledge of the character of the instrument gained by the subscribing witnesses from looking at the attestation clause, does not constitute a testamentary declaration by the decedent, unless it was clearly obtained by his request or direction, or at the least, his consent and privity.

If anything is to be taken as substitution for an express declaration, it must be such an act as is clear and unequivocal, and as gives the basis of a necessary inference that the testator conveyed, intended to convey, and knew he had conveyed to the minds of the witnesses, that he executed the paper as his last will and testament.

There must be mutuality as to the knowledge of all the parties, testator and witnesses, in respect to the nature of the transaction, and this must be evinced with reasonable definiteness by the facts.

The declaration must be made to each of the witnesses, at the time of subscribing or acknowledging, and as part of the transaction: it must be made in the presence of the parties, and must point to the particular instrument in process of execution.

Wills of real estate are governed, so far as relates to the forms of execution, by the law of the place where the land is situated.

Where the decedent made his will at Charleston, in South Carolina, where he then had his domicil, according to the forms prescribed by the laws of that State, and subsequently removed to the city of New York, where he died,— *Held*, that the will so made was valid as to personalty, though not solemnized in conformity to the laws of this State.

In the continental jurisprudence, the rule that the act is valid if performed according to the *lex loci*, is universal in respect to a testamentary disposition of movables.

Where the *lex loci actus*, and the *lex loci domicilii* are both conformed to, so far as relates to the forms of the testament, a subsequent change of domicil to a place where other forms are required, will not invalidate the instrument.

The statutes of this State recognize the validity of foreign wills of personalty made according to the *lex loci actus*, and do not admit of a revocation to be effected by a change of domicil.

D. P. HALL,
D. D. FIELD, *for Executor.*

I. The testimony establishes three out of the four require-ments of our statute as to the mode of executing wills ; and the only question, therefore, is whether the testator declared the paper to be his last will and .testament. Our former statute of 1813, was the same in substance as 29 *Charles II. C.* 3, and contained no express provision upon the subject of publication. The recent English statute dispenses with pub-lication altogether, but the Revised Statutes of New York require that the testator shall declare the instrument to be his last will and testament. It must affirmatively appear that the testator did not declare the instrument to be his will. (*Brinckerhoof* vs. *Remsen*, 8 *Paige*, 498). In the present case this negative nowhere appears, while it is proved dis-tinctly that the testator did declare by actions, by directions and by signs, that he intended the instrument to be his will.

II. The question is, what is meant by declaring. The decisions are, that anything that indicates an intent, is suffi-cient, and it is not necessary that the testator should in express terms or language, declare that his name signed to the will was so signed by him, or that he should declare the instru-ment, in so many oral utterances, to be his will ; but he should say or do something " in the witnesses' presence, indicating his intent." (*Jauncey* vs. *Thorne*, 2 *Barb. Ch. Rep.*, *p.* 40 ; *Nelson* vs. *McGiffert*, 3 *Barb. Ch. Rep.*, *p.* 162.) " No particular form of words is necessary to be used by the testator, in declaring the instrument signed by him to be his will, if he communicates to the attesting wit-

nesses the information, that he knows and understands the nature of the instrument he is executing, and intends distinctly to recognize it as his will." (*Brinckerhoof* vs. *Remsen*, 8 *Paige*, 487.) Again: "Under the ·Revised Statutes, the subscribing witnesses must, at the time of the execution, know it to be a will, and must know that the testator understands it to be, and means to execute it, as a will." (*Ibid.*, 847, 8 *Paige.*) And again : The attestation clause, of itself, is evidence of publication, unless the witness swears to two things, in opposition to that *primâ facie* proof : 1st, That the testator did not declare the instrument to be his will. 2d, That the attestation clause was not read or understood at the time of the execution of the instrument. This is evident from all the decisions upon that statute. It was so held in the late will case of *Grant* vs. *Grant*, in 1st *Sandford's Chancery Reports.*

"When a will is produced, subscribed by the testator, with an attestation clause signed by two witnesses, stating that he subscribed it in their presence, and declared it to be his last will and testament, such subscription and publication will be presumed, on proof of the signature of the witnesses, although they have forgotten it." (*Grant* vs. *Grant*, 1 *Sandford's Ch. Rep., p.* 235.) And Chancellor Walworth observed in the case in 8 Paige: "I think there can be no reasonable doubt that even if the attestation clause alone had been read over in the hearing and presence of the testatrix, so that she knew and understood its meaning, her request to them to attest it as witnesses, would have been such a recognition of the will as to make it a good execution thereof, according to the spirit and intent of the statute." (*Brinkerhoof* vs. *Remsen*, 8 *Paige, p.* 499.) And the Court of Errors took the same view of the matter, in affirming the chancellor's decision in the same case; and in the 26th *Wend., p.* 331: "No particular form of words is necessary, but there must be a substantial compliance with the statute, some communication to the witnesses, indicating the intention to give effect to the instrument as a will." (Judge Nelson, in *Remsen* vs. *Brink-*

*erhoof*, 26 *Wend.*, *p.* 324, 331). And again: "The legislature only meant that there should be some communication to the witnesses, indicating that the testator intended to give effect to the paper as his will." (*Ibid, p.* 332.) "Any communication of this idea, or to this effect, will meet the object of the statute," . . . "some act, some sign." "I agree that the mere want of recollection of the witnesses, that the testator indicated the instrument to be his will, after signing the attestation clause, ought not to be evidence, *per se*, of noncompliance with the statute." (*Ibid.* See also the remarks of Senator Verplanck, in the same case, 26 *Wend. p.* 339.)

I say, therefore, in the language of the marginal note to 26 Wend., 324, that there must be affirmative proof of the want of publication; the mere want of recollection of the witness is not sufficient to defeat the will.

III. The Revised Statutes authorize the probate of this instrument as a will of personalty, if it was executed according to the laws of South Carolina, where it was made. (2 *R. S.*, *p.* 253, § 81, 84; *Torrey* vs. *Bowen*, 15 *Barb., S. C. R., p.* 304.)

Whether the deceased was in point of fact an inhabitant of New York at the time of his death, is a question; but as the petition for the probate of his will styles him an inhabitant, we shall, on the present motion, (and until further proof is taken), regard the testator as domiciled here at the time of his death, on the 6th day of December, 1854. If then he was an inhabitant of New York at the time of his death, and the will was made in South Carolina in 1849, where the testator was at that time domiciled, can his will be admitted to probate in New York, (he leaving personal estate here), either at common law, or under our statute, and as to the personal property found within this jurisdiction?

This gives rise to two inquiries.

First: What is the law of South Carolina respecting the manner in which wills of personal estate shall be executed?

Second : Supposing the will to have been executed in conformity to the law of South Carolina, so as to pass personalty at the time it was executed in 1849; and supposing the testator to have been then domiciled there, can a change of domicil from South Carolina to New York in 1854, make void a will which was previously valid, by reason of this removal, and by reason of a conflict between the New York and the South Carolina statute, touching a mere matter of form, or the want of publication of the instrument as a will?

With respect to the first question, the statute of South Carolina, passed in 1825, provides, that "all wills, or testaments of personal estate, after the 4th May, 1825, shall be executed in writing, and signed by the testator, or by some person in his presence, and by his express direction, and shall be attested and subscribed in the presence of the testator, by three or more credible witnesses, or else they shall be utterly void and of no effect." (*Laws of South Carolina, Vol. VI.*, *p.* 238; and *General Index of do., p.* 606.) All these requirements of the statute were complied with in the present case, and no publication of the will was requisite by the laws of South Carolina.

IV. Then as to the second question—a change of domicil —does that avoid a will previously valid, in consequence of a conflict of laws touching a mere matter of form ; that is, the want of publication of the instrument as a will, required by the New York statute? Now as to this, the counsel for Mr. Mootrie rests himself exclusively upon a single clause, (expressed in very general, if not hesitating language), in Judge Story's Conflict of Laws, § 473.

On examining this matter, the court will find that Judge Story does not rest this declaration on any common law authority whatever, neither does he cite any civil law authority touching the question of the form of execution. The civil law authority (*Voetius* on the Pandects) quoted by him, is limited entirely to the status or capacity of the testator to make a will—the case of infancy, of marriage, and the like.

The language of Judge Story is not decisive, even on the point of capacity. He expresses himself cautiously, even, as to that, while he does not touch upon the effect of a change of domicil, as to the question of the form of the execution of the will. Neither does Voetius, whom he cites.

V. Now under our own decisions, a distinction is made; and it has been held, in this court, that an alteration of the statute law, between the time of making the will and its probate, or the death of the testator, touching the form of execution at least, does not avoid a will. (*Price* vs. *Brown*, 1 *Bradford*, *p.* 291.)

And yet, as a general rule, it would seem that it is the law of the testator's domicil at the time of his death, that is to govern in reference to wills of personalty. The form of the execution of the will is an exception. If this be so, as to the statute law, it would be right strange that an accidental change of domicil by the testator should have a greater effect in rendering his will a nullity, than a change in the statute law of the country where it was made, between the time the will was made and the death of the testator. And it cannot be so.

We concede that the maxim is, that "*mobilia sequuntur personam*," a rule which is well expressed by Lord Loughborough, in the case of Sill *v.* Warswick, (1 *Hen. Blackstone*, *p.* 690.) "It is a clear proposition (says he,) not only by the law of England, but of every country in the world where law has the semblance of a science, that personal property * * * follows the law of the person."

It was under this rule that the Supreme Court of Pennsylvania held, that the will of Jean Theil, a Frenchman domiciled in St. Domingo, and who died there, and who made his will there—was void in Pennsylvania, because it was not executed in conformity to the requirements of the French law existing at the time it was made in St. Domingo, although perfectly conformable to the laws of Pennsylvania, where the property was found.

It is the law of the country where the testator made his will and where he died, that is to govern in such a case; not the law of the country where the personal property happened to be found at his death; and the rule is founded upon the comity of nations, just as it is in reference to contracts. In reference to contracts, the *lex loci contractûs* is deemed to be written into the contract itself; the parties to the contract being supposed to have had the law of the place of contract in view while making the contract—and so courts in other christian countries give effect to the contract according to the law of the place of the contract, and this upon the principle of national comity. And it is upon the same principle of comity, that the "*lex loci actûs*" in reference to wills is recognized in foreign countries, in cases where there is no conflict of laws. And even if there be a conflict of laws between the country where the will was made and where it is sought to be proved, it will make no difference, if the will be executed according to the law of the testator's domicil at the time of his death. But if the testator has changed his domicil after making his will, and dies in a foreign country where he had acquired a residence, and there is a conflict of laws between the country where he made his will and the country where he was domiciled at the time of his death; then it seems, on the question of capacity to make a will arising, the law of the domicil at the time of his death, will govern—but this is not so where the question is one having reference merely to the form of the execution of the will.—This court seems to have held in the case of McCormick, (2 *Bradford*, 169,) the very point we contend for, touching a change of domicil and the form in which a will is executed.

We understand this to be the scope of the Chancellor's decision in the case of Robert's will, (8 *Paige*, 524,) where he draws the same distinction now taken between the case of incapacity to make a will, by the law of the country where the will is attempted to be proved, and the case of a will objected to only as to form of execution.

VI. But we conceive, that let the civil and the common law be what they may, the New York statutes were intended to settle the question, at least so far as the mere formal execution of a will is concerned—by in the first place allowing wills both of real and personal estate to be admitted to probate, if executed in conformity to our own law, no matter where the testator may have been domiciled at the time of his death; and secondly, by allowing wills of personal estate to be admitted to probate, if executed according to the law of the State or country where the testament was made, and this irrespective of the place where the testator was domiciled at the time of his death. (2 *R. S.*, *p.* 252; § 77, 81; 2 *Paige*, 214; 6 *Paige*, 184.)

Now independent of the statute, the will of a testator made in South Carolina, for example, (provided the testator was domiciled there at the time of his death,) may be admitted to probate here, if executed according to the law of the domicil at the time of his death. Jean Theil's will, (1 *Binney*, *p.* 336,) might have been admitted to probate in Pennsylvania, if it had been executed in accordance with the law of St. Domingo, where the will was made, and where the testator was resident when he died. The statute then was intended to provide for other cases than those where the testator was domiciled abroad at the time of his death. Amongst other cases, it was intended to embrace the case where the testator sees fit to change his domicil intermediate to his making his will, and the time of his death: for it says, "wills of personal estate duly executed (by persons residing out of this State,) according to the laws of the State or country in which the same were made, may be proved," &c.

And it also comprehends both citizens of this State resident abroad, and those who are not citizens of this State—for the 84th section says, "no will of personal estate made out of this State by a person not being a citizen of this State, shall be admitted to probate," &c. &c., "unless such will shall have been executed according to the laws of the State or country in which the same was made."

It is evident, at least, so far as relates to matter of form, that the will as to personal property should be admitted to probate in this State, provided it is executed according to the law of the place where it was made, and the testator was domiciled at the time,—and this at common law, and before the Surrogate of the county wherein the testator's personal property is situate, or happens to be found at the time of his death. But if there is any doubt about this in a cause where the testator shall have changed his domicil, after making his will, and dies here—then the statute authorizes a will of personal estate executed abroad, to be proved under a commission, provided it be executed according to the laws of the State or country in which the same was made—if the testator be a citizen of this State at the time of his death : and at the same time it authorizes a will of real estate (situate in this State,) if executed abroad, to be proved upon a commission, provided it be executed according to the laws of this State. And then it goes further, and authorizes a will of personalty executed abroad, whether by a person domiciled here or not, (but who was not a citizen of this State,) to be proved upon a commission, if executed in conformity to the laws of the State or country where the will was made. As to personalty, the statute clearly recognizes the place where the will was made, and not the place where the testator was domiciled at the time of his death : and if the will be executed according to the law of the place where the same was made, that is sufficient, whether the testator was a citizen of this State, or not a citizen of this State, and whether the testator was domiciled here at the time of his death, or domiciled abroad. The statute looks only to the place where the will was made, at least so far as matters of form are concerned.

WILLIAM MOOTRIE,
M. G. HARRINGTON, *for Contestants.*

I. The testator was domiciled in the State of New York at the time of his death. The will, therefore, must have been

executed and published according to the statutes of this State, or it cannot be admitted to probate. (*Story's Conflict of Laws*, § 466, 7, 8, &c.) That the testator changed his domicil after the execution of the will, does not affect this proposition. (*Story's Conflict of Laws*, § 473, and cases cited.*)

II. The sole question in this case is, whether the testator at the time he acknowledged the execution of the will to the witnesses, declared the instrument so subscribed and acknowledged by him to be his last will and testament, in such manner as to comply with the statute. It is insisted that he did not.

1. He made no declaration whatever to, or in the presence of, the witnesses, or either of them, at the time he acknowledged his signature thereto, and they subscribed as witnesses. In this all the witnesses agree.

2. He made no declaration whatever as to the nature of the instrument, to any of the witnesses, except Messervey, at any time.

All that he said to Messervey was—taking the evidence in the strongest form in favor of the probate, " I wish you to go below and get me two witnesses to the will."

This is no " declaration" within the meaning of the statute. It was not made either at the time of the subscription or at the time of the acknowledgment.

It was not made with such distinct and certain reference to any particular instrument as to preclude the possibility of mistake or misapprehension.

It was not a declaration that the instrument was his " last will and testament" even if the reference to the instrument had been certain, and the declaration made at the time of the execution or acknowledgment.

Even if this was a sufficient declaration to Messervey, his repeating it to Mahoney afterwards, how long does not appear, not in the presence of the testator, and when the instrument was not present, and had not been seen by him, was no declaration to Mahoney.

3. Admitting that the witnesses Messervey and Mahoney each read the attestation clause, at the time of subscribing, that does not amount to a sufficient declaration. Because,

The clause itself does not contain the declaration required. It is " signed, sealed, and delivered as, and for, his last will," &c.

It does not say, " declared" to be his last will, &c.

The attestation is not, *per se*, the declaration of the testator, but is the declaration of the witnesses.

He may adopt it as his declaration. But there must be evidence that he did so adopt it. And if he do so, it must contain all that the statute requires.

This adoption cannot be presumed, it must be proved. Both the evidence and the probabilities are, that he did not adopt it. If he did adopt it as his declaration, it was not read over or announced to the witnesses at the time, nor did they read it intelligently, so that they fully understood beyond the possibility of mistake, that the testator meant and intended thereby to declare to them that the instrument was his last will and testament.

But, admitting that this attestation clause contains enough, that it was read and understood by the witnesses, and was adopted tacitly by the testator, still it is insufficient, and not a compliance with the statute.

The case of *Brinkerhoof* vs. *Remsen*, 8 *Paige*, 488, does not decide this point. It was a mere speculation of the Chancellor.

In 26 *Wendell*, 325, when the same case was decided by the Court of Errors, Senator Verplanck says, *p.* 337, it must be made known to each witness, and in such manner to " his own understanding and intention" as " to leave no doubt upon their minds." So page 339, there must be " open evidence of knowledge and intent" in order to exclude the possibility of delusion or deception." (See 1 *Sandford Ch. R.*, 325.)

But there is no case in the books in which this precise point as material and necessary to the decision has ever been ruled.

All the cases agree that there "must be a declaration by the testator, that the instrument is his last will and testament." (4 *Sandford, Sup. C. R.*, 10.) This was a stronger case than the one under consideration. See *page* 17, &c.

4. The fact that the witnesses understood that the instrument was a will, is insufficient. (4 *Sand. Sup. C. R.*, 10–17, 2 *Bradford, R.*, 163.)

Such a general understanding drawn from hearing conversations, casual remarks, whether by the testator or others in his presence, and inferences drawn from circumstances and conversations, even if the inferences be correct, is insufficient.

All the cases bearing upon the subject of publication, go to this point.

The possibility of "mistake," "delusion," "deception," must be excluded by the evidence.

There must be a distinct affirmative performance of all the statutory requisitions. (2 *Bradford*, 165; 2 *Selden's R.*, 120.)

III. The fair and just import of the evidence, taken in connection with the circumstances under which the witnesses have testified, absolutely excludes the idea that there was any such declaration as our statute requires.

The very truth of the case appears in the testimony under the commission.

These facts are that Messervey overheard that the testator was going to make a will—that he was told to get two witnesses—that he did so—that he told one Mahoney it was to witness the testator's will—that the testator acknowledged the signature and seal then to be his, and pointed them to the place where they were to subscribe, and that they did then and there subscribe.

IV. The next question is, what will be the effect of a change of domicil after a will is made, of personal property, if it is valid by the law of the place where the party was domiciled, when it was made, and not valid by the law of the domicil, at the time of his death.

The contestants submit that in such a case the will is void.

The principle on which this proposition stands has a very broad foundation. It is broader and deeper than public policy. It stands upon the principle of public necessity.

As respects real estate, the will must be according to the *lex rei sitæ*, and why?

Because necessity requires that the laws respecting the alienation, acquisition, and distribution of real estate should be certain and uniform in each particular State, otherwise every thing would be thrown into confusion, and there would be no security for that kind of property—no certainty—no possibility of quieting titles.

Why is the law respecting movable property different?

The principle is perfectly settled that the law of the place of the domicil regulates the distribution of personal property. *Jarman on Wills*, 2, 3; 3 *Binney R.*, 336. This principle will not be denied.

The reason of the rule is, that personal rights, privileges, and disabilities are, and of necessity must be, governed by the law of the domicil.

Otherwise there would be perpetual conflict of jurisdictions and of rights. It would be intolerable to make that wrong for one man which would be right for another, and that too at the same time and place.

This principle does not rest on the municipal regulations of particular states or nations. It rests upon public necessity and is made the law by the common consent of mankind—all recognizing this necessity.

Movable property which can be transported from place to place, is called personal property, because it appertains to the person, and is supposed to be (and certainly it always may be) always carried about with the person. It goes with him wherever he goes, and remains with him wherever he tarries. Such is the theory.

Hence it is that the same rule which regulates and governs personal rights, privileges, and disabilities extends to and includes every thing appertaining to the person, and to personal property.

We submit that this broad principle necessarily includes the question now before the court.

It is settled that the instrument propounded as a will to affect movable property, must be an effectual testamentary instrument by the law of the domicil of the testator. (1 *Jarman on Wills, p.* 4.)

And the place where a man dies is presumed to be his domicil, *prima facie.* (1 *Jarman on Wills, p.* 9; 3 *Vesey,* 201.)

Where a will is made by one of legal age to make a will by the law of the place of his domicil, and the testator afterwards removes and acquires a domicil in a State where the law requires a greater age to entitle him to make a will, and dies, then the will is invalid:

Even although the testator at the time of his death had become of legal age to entitle him to make a will by the law of the place of his last domicil. (4 *Burge,* 580, referring to *Voet. Lib.,* 28 *tit.,* 3 *n.* 13.)

This proposition fully covers the present question, and in principle is not distinguishable from it.

We have not been able to find a ruled case exactly like the present one. But the terms of the general rule are declared by Judge Story to establish the principle for which we now contend. The law of the actual domicil must govern. (*Story's Conflict of Laws,* § 473, *and the cases there cited, fully sustain him. See also, Ibid.,* § 555 to 574.)

There is no case or principle whereby the contrary is decided.

THE SURROGATE.—The will propounded for probate, bears date the 14th day of August, 1849; and was executed in the city of Charleston, South Carolina, where the decedent then resided. The petition for probate states, that the decedent at, or immediately previous to the time of his death, was an inhabitant of the county of New York. . Assuming that to be the fact, two points arise—first, whether the will was executed according to the laws of the State of New York; and second-

ly, if not, whether if made according to the laws of South Carolina, it was a valid will at the decedent's death.

The will was attested by three witnesses, and the usual ceremonies appear to have been performed, except the testamentary declaration, the proof as to which is alleged to be deficient.

The testimony was at first taken under a commission issued to Charleston, and subsequently two of the witnesses came to New York, and were personally examined before me. Heckmann, one of the witnesses who was not re-examined, says, he was requested by the decedent at the time of the execution " to witness his signature to a paper ;" that " he was called upon at that time and place by Col. Hunt to witness a paper, but Col. Hunt did not state what it was ;" that " Col. Hunt acknowledged the signature and seal to the paper ;" " he made no declarations to witness as to what the paper to which he acknowledged his signature was ;" " Col. Hunt said nothing about his will or witnessing his will ;" " Col. Hunt said nothing about the nature or contents of the paper ;" that he " signed the paper without knowing what it was— never knew until recently told ;" " Col. Hunt made no declarations in the presence of witness—he merely acknowledged his signature, and requested him to sign as a witness ;" " he heard no declaration from Col. Hunt." These repeated answers to repeated questions touching a testamentary declaration, put it beyond all question, if any evidence can, that no declaration as to the nature or character of the instrument was made to this witness by the decedent. Heckmann also testifies, that only one other person was present in the office with Col. Hunt, and that he was not acquainted with that person. He also says, " he knows nothing" about the signatures of the other witnesses, and that " nobody signed it" in his presence.

Mahoney in his testimony under the commission, says he " signed his name to the paper ;" that Messervey requested him to go to Col. Hunt's office, and he there " signed the paper" in the presence of the decedent and of Messervey, but

cannot remember whether Heckmann was present—" thinks Messervey said Col. Hunt wished witness to sign his name as witness to his will, but this statement was not in the presence of Col. Hunt, and Col. Hunt said nothing as to what the paper was ;" " simply acknowledged the signature and seal, without saying what the paper was ;" " thinks that the others signed at the same time with him ;" " knows that he was witness to some paper or instrument of writing which Messervey had told him was Col. Hunt's will; but cannot say that Col. Hunt did anything more than acknowledge the signature and seal, and request the witnesses to sign their names at the places where they are written ;" " he did not declare what the paper shown to witness was, he merely requested him and the others to sign the same as witnesses ;" that "he was in the habit of calling upon witness to act as a subscribing witness to written instruments, but never told the nature or contents of such papers to witness ;" that "he knew nothing about the contents of the paper when he signed it—Col. Hunt said nothing about them to witness,"—" said nothing to witness as to what the paper was which he desired him to subscribe." Messervey when examined under the commission, stated, that he was the clerk of the decedent—was called into the office where B. F. Hunt was present, and was asked by the decedent to "subscribe his name to the paper," which he did, there being "no other person present at the time of his signing ;" that "he knew" at the time it was decedent's will, " but that Col. Hunt did not tell witness it was his will ;" that he subscribed his name in the presence of the decedent, " but not in the presence of John Mahoney and Adolph Heckmann, or of either of them ;" that " Col. Hunt acknowledged his seal and signature ;"—that the will is in the hand-writing of the decedent; that " Col. Hunt was in the habit of calling on him to witness written instruments, but not of telling him of their nature or contents ;" that "Col. Hunt never did tell him of the nature or contents of any instrument of writing which witness was ever called upon to witness; but that he knows from conversations between Col. Hunt and his

son B. F. Hunt, jr., just previous to the execution of the will and his subscription as a witness, that the will so subscribed, was the will of Col. Hunt; and also that Col. Hunt knew that witness knew that said instrument was the will of Col. Hunt;" that "he thinks he was present when Mr. Mahoney signed, at the request of Col. Hunt—he called Mr. Mahoney to witness the will."

On the return of the commission under which this evidence was taken, it seemed to me the testimony disproved a testamentary declaration; but upon its being urged that there was a possibility of a declaration having been made by the reading of the *testatum* clause, I allowed the proponent the opportunity of a further inquiry.

On his examination before me, Messervey testified, that the decedent requested him to go below and get " two witnesses to the will." This is I think in conflict with his testimony under the commission. He also says, that Col. Hunt pointed out the spot where the witnesses were to put their names, and that he acknowledged his signature. Messervey further testifies that he the witness read the *testatum* clause.

Mahoney on being recalled stated, that Messervey, on the day the will was executed, called on him, and said that Col. Hunt wished him " to witness his will,"—that on proceeding to the place, the paper was lying on the table—he looked over it " about a minute,"—the decedent then stepped up, acknowledged the signature, and then "pointing his finger to the place where my name is written," said, " see here, sign your name there." This witness also says, he glanced over the attestation clause, and saw the instrument was a will. I do not perceive that the case is helped any by these new or further statements of Messervey and Mahoney. All the witnesses agree that the decedent did not declare the instrument to be his will at the time of the execution—that so far as his words are concerned, he used no expression indicative of the nature of the instrument, whether it was a will, deed, or any other document; that he simply acknowledged his signature, and requested the witnesses to sign at a particular place point-

ed out by him. These then were all the acts performed by the decedent. The knowledge of the character of the instrument gained by the subscribing witnesses from looking at the attestation clause, does not constitute a testamentary declaration by the decedent, unless it was clearly obtained by his request or direction, or at the least, his consent and privity. If anything is to be taken as substitution for an express declaration, it must be such an act as is clear and unequivocal, and as gives the basis of a necessary inference that the testator conveyed, intended to convey, and knew he had conveyed to the minds of the witnesses, that he executed the paper as his last will and testament. There must be mutuality as to the knowledge of all the parties, testator and witnesses, in respect to the nature of the transaction. We cannot spell out, and guess at this mutuality. It must be evinced with reasonable definiteness by the party. There is not enough in the proof to satisfy me, that Col. Hunt had reason to know that the witnesses were aware the paper was his will, or that he wished them to know that. Messervey it is true, says, the decedent requested him to go below and procure witnesses to his will, but that request was made before any one except himself had attested; and although he may have communicated that request to the other witnesses in the same words, it would not supply the defect of a testamentary declaration to the witnesses in person. The declaration must be made to each of the witnesses at the time of subscribing or acknowledging, and as part of the transaction. It must be made in the presence of the parties, and must point to the particular instrument in process of execution. I am of the opinion, therefore, that this instrument was not executed in conformity with the provisions of the statutes of this State. As wills of real estate are governed, so far as relates to the forms of execution, by the law of the place where the land is situated, this instrument is not valid so as to affect lands in the State of New York; and it cannot be admitted to record as a will of real estate. But the question still remains, whether it is to be treated as invalid as a will of personalty.

In the State of South Carolina, the formalities requisite to the due execution of wills, were regulated by the Statute of Frauds, (29 *Car.*, 2, *ch.* 3; *Statutes S. C. vol.* 3, *p.* 382,) until the year 1825, when a stricter rule was adopted, requiring the instrument to be signed by the decedent, and to be attested by three witnesses. (*Statutes S. C., vol.* 6, *p.* 238.) At the time of its execution, this will was made in a form sufficient to carry real and personal estate according to the law of the place where it was made, and where the decedent was then domiciled. It was a good and valid instrument, duly executed in conformity with the laws which then regulated the act. But a most interesting question arises as to the effect upon the validity of this instrument by a change of the decedent's domicil to the State of New York. I find at the outset the great authority of Justice Story against the validity of a will, which though made under such circumstances, does not conform to the law of the testator's domicil at the time of his death. He says, "But it may be asked, what will be the effect of a change of domicil, after a will or testament is made of personal or movable property, if it is valid by the law of the place where the party was domiciled when it was made, and not valid by the law of his domicil at the time of his death. The terms in which the general rule is laid down, would seem sufficiently to establish the principle, that in such a case the will or testament is void; for it is the law of his actual domicil at the time of his death, and not the law of his domicil at the time of making his will or testament of personal property, which is to govern." The distinguished jurist cites John Voet in support of this proposition; but the passage cited from Voet, relates only to the question of testamentary capacity, and not to the forms of the instrument. The case he puts is this: if one living in Holland, where a testament may be made at fifteen years, should make his testament, and then change his domicil to Utrecht, where full puberty (eighteen years,) is required in a male testator—his testament as to movables would be rendered void by the change. The same thing would occur he says, if one should

institute his wife heir in a country where that was lawful, and then change his domicil to a place where it was not lawful. It is manifest that the observations of Voet touch only upon the point of testamentary capacity, and not upon the forms and solemnities required for the valid execution of a testament. It is impossible, indeed, he should have intended to apply the rule as to the effect of a change of domicil, to testamentary forms; for he himself is one of the strongest supporters of the doctrine that in respect to forms, *locus regit actum,* and in sustaining it, he has gathered a most formidable array of authorities. ( *Voet, De Statutis, lib.* 1, §§ 13, 14, 15.) He shows, that it is a rule of universal recognition, even as against the *lex domicilii,* unless indeed, it appears that the law of the domicil has been avoided by fraud. He says distinctly on this very case :—*Adeoque si Hollandus in Hollandiâ de prædiis Ultrajectinis testamento disponat, effectum sortiri debet voluntas ejus, quia observavit solennia loci in quo actus testandi celebratus fuit. Nec infirmabitur ex eo quod forte post conditum ita in Hollandiâ supremum elogium Ultrajectum migret; cùm enim peregrini cujusvis in Hollandiâ reperti, ibique more Hollandico testantis, voluntas etiam post reditum in patriam rata maneat, si nihil aliud impediat iniquum foret, migratione solâ ad locum alia solennia desiderantem, interrumpi actum in prioris domicilii loco solenniter ante celebratum.*—(Liber 28, Tit. 1, § 27 : *qui test. fac. poss.*) It would be unjust, he says, that a will executed in Holland according to the solemnities there required, should be broken solely by a change of domicil to a place, whose laws demand other solemnities. I proceed now to show that this is not the opinion of Voet alone. Van Leeuwen, commenting upon the subject, has this passage,—" Hence this question has arisen, whether a will made according to the practice required at the place where it is effected, as in Holland for instance, having been duly confirmed before a notary and two witnesses, ought likewise to take effect in other places, where other and more numerous solemnities are required, as in Friesland the number of witnesses required is seven, * * and upon the general

opinion of the Doctors, it was understood that a will confirmed at a certain place according to the solemnities required there, takes effect everywhere without distinction, because the solemnity required to the existence of anything, belongs to the knowledge and jurisdiction of the government of that place where it ought to be observed. And if a person be obliged to follow the practice of different places, any person who lives now at this and then at another place, would be obliged to make so many wills, or to observe different forms in one and the same will; and a will, which is but a single act, would be judged of according to different forms of law." (*Com. p.* 215.) Grotius says: " *Ubi de formâ sive solemnitate testamenti agitur respici locum conditi testamenti.* (Epis. 467, in 4 Burge. Com. p. 220.) Dumoulin states the rule very broadly—" *Est omnium doctorum sententia ubicunque consuetudo vel statutum locale disponit de solemnitate vel formâ actûs, ligari etiam exteros, ibi actum illum gerentes, et gestum esse validum et efficacem ubique, etiam super bonis soli extra territorium consuetudinis vel statuti.*" (Dumoulin cited *Story's Confl. Laws,* § 441.) M. Toullier says,—" *Enfin il faut observer que la forme des testaments ne dépend ni de la loi du domicile du testateur, ni de celle des biens qui sont donnés, ni de celle du temps où le testateur vient à décéder. Elle ne dépend que de la loi du* lieu *et du* temps *de la confection du testament.*"—(*Le droit Civil Français, vol.* 5, *p.* 290, § 382.) Thus Dumoulin declares, that by the consent of all the learned, the local custom governs the form of the act; and M. Toullier, that the form does not depend upon the law of the testator's domicil, nor of the *situs* of the goods, nor of the time of the testator's death, but upon the law of the place, and of the time of the execution of the will. M. Duranton also states, that the form of the testament is regulated by the law of the time when it was made, and shows that in this respect the rule differs from that which prevails in regard to the testator's capacity. (*Cours de droit Français, vol.* 9, *p.* 15, § 14, 15, 16.) M. Felix in his Conflict of Laws, says,—" *Un principe aujourd'hui généralement adopté par l'usage des nations, c'est que la forme des*

*actes est réglée par les lois du lieu dans lequel ils sont faits où passés."—(Conflit des Lois, cited by Story, Confl. of Laws and note, p.* 727.) Merlin defines the following distinctions, "In regard to testaments, there are three things to consider—the capacity of the person, the disponibility of the goods, and the form of the disposition. The first is governed by the law of the domicil, the second depends upon the situation of the goods, and the third is governed by the law and custom of the place where the disposition is made." He adds, "it is needless to recall the disputes which were raised upon this point by the old civilians—it is many years since they were finished ; and now "—*" tout le monde convient unanimement que la forme de tester dépend du statut, ou de la coutume du lieu où l'on teste."*—All the world agree unanimously that the form of making the testament depends on the law, or the custom of the place where it is made. (*Répertoire Universel et raisonné de Jurisprudence, vol.* 34, *p.* 111, *Guyot, Tom.* 16, *p.* 167.) In the reasoning of M. De Voisins upon the testament of M. De Pommereuil, the grounds of this rule are carefully elaborated—such as the necessity of counsel, the difficulty or impossibility of practising other forms, the ignorance of other forms, the variety of forms, the necessity of adopting one, and the convenience of adopting that of the place. He says, "*les nations en sont convenues, et elles vivent aujourd'hui entr'elles sur la foi de cette règle."*—(*Merlin, Art. Testam.*) Pothier speaking on this subject, says,—"The testament in France, ought to be made in the form prescribed by the law of the place where it is made, although the testator has not his domicil in that place, and was there only temporarily,*— that although there would appear to be more difficulty in regard to testaments made by a Frenchman in a foreign country—foreign law not being received in France ; nevertheless, "*néanmoins les arrêts les ont jugés valables : parce que c'est une règle du droit des gens de se conformer, pour la forme des actes, aux lois du lieu où on les passe :"*—they have been adjudged valid, because it is a rule of the law of nations to conform in respect to the forms of acts, to the law of the place

where they are effected.—*Œuvres de Pothier. Nouvelle edition, par M. Dupin. Tom.* 10. *Coutumes, Tit.* 16, § 2, 5, 11.) I suppose it impossible to find a single authority among the Continental jurists of the highest character impeaching the doctrine sustained by the authors I have cited, so far as it applies to movables. M. Felix criticises the opposing opinions of three modern authors who question the rule, with entire success. Besides the authorities I have quoted, Vattel, Sande, Peckius, Paul Voet, Christinæus, Rodenburg, Vinnius, Boullenois, Bouhier, and Huberus agree to the principle, and most of them press its application even to immovable property. It is recognized in the codes of Louisiana, France, the two Sicilies, and Sardinia; and is the law of Spain, Holland and Germany. (*Jurisprudence du XIXme siècle, par M. M. Sirey et de Villeneuve, pp.* 1022-26-40. *Code Napol. Art.* 99. *Concordance entre les Codes Civiles Etrangers et le Code Napoleon, par M. de Saint Joseph.* 4 *Burge. Com. p.* 585.) It has such universal acceptance, that Pothier emphatically styles it a rule of the law of nations. Thus according with the usage of civilized nations, and the concurrent opinion, and judgment, and enlightened reason of the most eminent civilians, it remains to consider how far it has been adopted by the common law. And in this connection it may be observed, that to adopt the *lex loci actus* as to the form of the will, does not necessarily oppugn the *lex domicilii.* The law of the domicil undoubtedly governs in cases of testacy and intestacy, both alike; but then the inquiry arises, what is the law of the domicil in the particular case. The adoption of the *lex domicilii,* is itself a concession to foreign law upon principles of public convenience, national comity, and right reason; a concession which has been made, justified, and sustained by an appeal to the common consent of nations and the authority of jurists. In determining what is the law of the domicil in any given case, where the local law is not positively settled by legislation, there would seem to be no good reason why a similar deference should not be paid to the *jus gentium,* and the opinions of learned men. It appears from

the authorities I have cited, that the rule *locus regit actum*, has been generally received, perhaps not so much as an exception to the law of the domicil, as a part of that law itself—so that in the adoption of the *lex domicilii* in this class of cases, it may reasonably be inquired why we should not take with it its universally accepted modifications.

In *Potinger* vs. *Wightman*, 3 *Merivale*, 67, on a question of succession and domicil, and the law of England being silent on the subject, Sir William Grant observed, " on the subject of domicil, there is so little to be found in our own law, that we are obliged to resort to the writings of foreign jurists for the decisions of most of the questions that arise concerning it." It may be well to see whether the precise point in controversy in the present case has been adjudicated in the English or American tribunals.   In the case of the Duchess of Kingston, her will of personal estate, executed at Paris according to the English, but not according to the French forms, was admitted to probate in the Ecclesiastical Court. (Cited in *Curling* vs. *Thornton*, 2 *Add. R.* 21.)   Justice Story says she was domiciled in France, Mr. Burge, that she had not relinquished her English domicil; but probably no stress was laid on that point, as she had obtained Letters Patent from the French king, giving her the same power of devising as she would have had in England.   The opinion of M. Turgot in favor of the validity of the instrument, was based on the supposition of an English domicil—and proceeded on the principle, that although the solemnities of the *lex loci actus* were not observed, the will would be good if conformed to those of the domicil.—

In *Stanley* vs. *Bernes*, 3 *Hagg.* 373, codicils were rejected, because not made in conformity with the forms of the Portuguese law, which was the *lex loci actûs et domicilii*. The deceased was domiciled in Portugal, and the codicils were executed there. This was the decree of the High Court of Delegates reversing the judgment of Sir John Nicholl. The grounds of the reversal do not appear; but in a subsequent case, Sir Herbert Jenner stated, that the principle decided was, " that if the instrument be not executed according to

the law of the domicil of the testator, it is invalid." He says, "The Court of Delegates having reversed the sentence of the Prerogative Court, it follows, (though no reasons are given by the court for its decision,) that the two codicils were pronounced against, on the ground that they were not executed according to the law of Portugal, where the testator was domiciled." (*De Bonneval* vs. *De Bonneval*, 1 *Curteis*, 856.) This conclusion is, I think too broad, for the codicils were not executed according to the *lex loci actûs ;* and it would be quite as sound a deduction, looking only at the case itself, to say, that they were rejected for that reason, as for the other reason. In the case last above cited, the Marquis De Bonneval left a will executed in England, conformably to the English law; but having his domicil in France, Sir Herbert Jenner determined that the validity of the will must be determined by the French tribunals, and for that purpose suspended proceedings. In *The Countess De Zichy Ferraris* vs. *The Marquis of Hertford*, 3 *Curteis*, 468, the testator left a will and a large number of codicils—some of the codicils were not executed according to the statute, (1 *Vict. c.* 26,) and one of them was executed at Milan, where the testator frequently resided, and had an establishment. The testator being domiciled in England, Sir Herbert Jenner Fust held, that this codicil was invalid, making the following observations:—"It is not pleaded that the late Marquis was domiciled at Milan; it is only pleaded that he was resident there, as a visitor, as he might have been in any other country, and therefore merely a temporary resident, having his domicil in this country, and therefore he was liable to the law of this country with respect to his testamentary disposition. The law of Austria, it is pleaded, would give effect to this codicil, as the act of a foreign resident there, and this may be perfectly true; but if the law of Austria would give effect to the paper, it does not follow that this court could decree probate of the paper, unless it can be shewn that the domicil of the party was in those dominions, and not in the dominions of England, because the domicil of the Marquis was in England : for it is too late now

to contend that the succession to personal property, either in cases of testacy or intestacy, is to be governed by any other law than the law of the country in which the deceased had his domicil. In the case of succession to the personal estate of an intestate, the cases are too numerous for the court to entertain any doubt that the succession is governed by the law of the domicil; and if there had been any doubt whether the succession to personal property in a case of testacy is governed by the same rule, such doubt would be removed by the decision of the Court of Delegates, in the case of *Stanley* vs. *Bernes*. It was there decided that a British born subject who had domiciled himself in Portugal, was bound in the disposition of his property to conform to the law of the country in which he had become so domiciled; and although in that case he had expressed an intention of returning to this country, yet, as he died in Portugal, a domiciled Portuguese subject, the court held, that his will could not be valid unless executed according to the laws of the country in which he was domiciled. Therefore, that case disposes of the whole question as to succession in cases of testacy, deciding that a will to be valid, must be executed according to the law of the country where the party was domiciled; and following that decision, I am bound to administer the law as I found it laid down by the supreme court, as the law of the country; and I am consequently of opinion, that the circumstance of the paper having been written and executed by the late Marquis at Milan, can give no effect to the paper, it not being executed according to the law of the country in which it is admitted he had his domicil." It thus appears, that on the authority of *Stanley* vs. *Bernes*, where the codicils were *not* executed in conformity to the *lex loci actûs*, the learned judge rejected a codicil which *was* executed according to the *lex loci actûs*. In the absence of the reasons of the court in *Stanley* vs. *Bernes*, it is impossible to say what general doctrine was laid down as applicable to cases of this character, for the facts before the court only called for a sentence in rejecting papers which conformed neither to the law of the domicil nor

to the law of the place where they were executed. It is obvious that the question in *Stanley* vs. *Bernes*, did not arise on a testament made with the solemnities required by the *lex loci actûs*, though deficient in those required by the *lex domicilii*. (4 *Burge*, 589. *See Curling* vs. *Thornton*, 2 *Add.* 6; *Hare* vs. *Nasmyth*, 2 *Add.* 25; *Craigie* vs. *Lewin.*, 3 *Curteis*, 435; *Collier* vs. *Rivaz*, 3 *Curt.*, 355; *Maltass* vs. *Maltass*, 1 *Robert Ecc. R.* 67.) Nor does it appear in the case of the Marquis of Hertford, how far the judgment of the court would have been affected had the testator been domiciled at Milan, at the time the codicils were made; though if the doctrine inferred from *Stanley* vs. *Bernes* be strictly applied, it would seem to exclude wills executed according to any other forms than those prevailing by law at the testator's domicil at the time of his decease. This case was taken before the Judicial Committee of the Privy Council, (3 *Notes of Cases, p.* 150;) and the decision below affirmed on the principle, that the English statute of wills, is to be construed as applying to the testamentary acts of all domiciled Englishmen, wheresoever done.

I am not aware, however, of but a single decision avoiding a will, made in pursuance of the forms required by the testator's domicil at the time it was made, but not in conformity to the solemnities demanded by the law of his domicil at the time of his death. The effect of this change of domicil does not appear to have been considered judicially, save in the case of *Nott* vs. *Coon*, 10 *Miss. R.* 543; where it was determined, that a will made in another State by a person then a resident of such State, but who afterwards removed to Missouri, and died a resident thereof, was invalid, not being made according to the law of Missouri. The grounds of this judgment do not appear—nor whether the will related to real estate or to personal. In *Desesbat* vs. *Berquier*, 1 *Binney*, 336, the decedent was an inhabitant of St. Domingo, at the time of making the will and at the time of his death; and the instrument though sufficient in form to pass personal estate in Pennsylvania, was declared invalid. But it was not valid by the law of St. Domingo, and therefore conformed

neither to the *lex loci actûs*, nor to the *lex domicilii*. In *Grattan* vs. *Appleton*, 3 *Story*, 755, the decedent was domiciled in the province of New Brunswick, and made certain testamentary papers at Boston. The law of his domicil was held to control, and the papers were declared invalid. Returning to the English cases, we find in *Price* vs. *Dewhurst*, 8 *Simon*, 279, 4 *My. & Cr.*, 76, a conjoint will made in 1807, by a husband and wife lately removed from a Danish colony, revoked by posterior wills of both parties made in England, where they were domiciled. In *Frère* vs. *Frère*, 5 *Notes of Cases*, 595, the will was made in England according to the English form, by a person domiciled at Malta, and it appearing that by the law of that island the *lex loci actûs* governed, the will was admitted. In *Moore* vs. *Budd*, 4 *Hagg.* 346, the decedent made his will in Spain, where he was domiciled; and it was rejected, not being conformable to the *lex loci actûs*, nor to the *lex domicilii*. In *Thornton* vs. *Curling*, 8 *Simon*, 310, there was no question as to the forms of execution—but Lord Cottenham intimated, that the provisions of the will, which was made in England by a British subject domiciled in France, controvening the civil Code, by providing for an illegitimate child to the exclusion of a widow and a legitimate child, might be disregarded by the Court of Chancery.

The precise question then in this case has not been determined. If it is to be tested by the general doctrine, that the law of the domicil at the time of the death, governs universally,—a principle which seems to be laid down in many of the cases,—then, although this point has never been directly passed upon, we still have a rule applicable to its solution. The English courts have undoubtedly come to the conclusion that the rule, *locus regit actum*, does not govern as to the forms of wills. The case of the Marquis of Hertford settles that point definitely. Whether the law of the domicil at the time of the death, will ever be applied where the domicil has been changed since the execution of the will, so as to effect the revocation of a will valid at the date of its execution, remains

to be seen. There seem to be just reasons why a change of domicil should not produce such a revocation. The form is not attached to the person, but to the thing done—it is inherent in the body of the act, which when performed with all the solemnities required by the law of the place where it is done, and by the law of the testator's domicil at the time, is a consummate and perfect transaction. The will is then a complete and valid instrument by whatever rule tested. It has an actual, integral existence. It is a will in due form. Is it to be changed by a change of abode?—is its validity to fluctuate with the migratory habits of the maker, and to depend upon the contingency of his residence at the time of decease? or originally performed with all lawful ceremonies, does it stand good once for all, unless revoked by the express act of the party? The *lex domicilii* has been adopted in England, and the *lex loci actûs* rejected; and it is supposed this determination is commended by reasons of simplicity; but in the nature of things, there does not seem to be more difficulty or complexity in determining one than the other. Either rule leads to the adoption of foreign law, and of necessity to its examination. I do not understand the *lex loci actûs* to be carried to the extent of governing the transaction, but simply that if executed according to that rule it may be good, though defective according to the *lex domicilii*. A will executed according to the law of the domicil at the time of the death, should be held good under all circumstances. Though defective according to this rule, if it still be conformable to the *lex loci actûs*, the continental jurists sustain its validity. If at the time of its execution it be made in harmony with the solemnities required by the law of the place where it was made, and where the testator was then domiciled, I can perceive no good reason in the nature of things, why it should be revoked by a simple change of residence of the maker to another country where other forms are required. The transaction is a perfect and valid act, by the common consent of the continental authorities; and in the absence of any authoritative decision repugnant to this view, their conclusions as well as

reasoning command my assent and judgment. It is not without interest as to this subject of revocation, to observe, that our statute seems to contemplate wills executed with other forms than those prescribed by our own law; and in declaring how wills shall be revoked in writing, uses such general terms as embrace other forms,—not giving any particular mode of revocation, but simply requiring the revocation to be " executed with the same formalities with which the will itself *was* required by law to be executed." Now, Col. Hunt's will was required by law to be executed in the precise way in which it was in fact executed—and was then a perfect and legal will. And how has it been revoked? By a change of residence? There is not a word in all our statute of a revocation effected in that mode; and if not, if this will was valid when it was made, and if no will in writing can be revoked, except in the cases and in the mode required by our statute, how then has this will been revoked? But there is another portion of our law, which appears also to be in harmony with the liberal usages of those countries where the customs and doctrines of the civil law prevail. At the revision of our statutes, a mistake was made in not providing for the proof of wills where the witnesses were out of the jurisdiction of our courts. This was remedied by the amendatory Act of 1830. (2 *R. S. p.* 67, §§ 63, 64, 65, 66, 67;) and the Chancellor was authorized to issue a commission for the purpose of taking proof in such cases; but these provisions apply only to wills executed according to the laws of this State. Another section provides for proving before the Chancellor " wills of personal estate, duly executed by persons residing out of this State, according to the laws of the State or country *in which the same were made;*" and then the succeeding section declares, that, " no will of personal estate *made out of this State, by a person not being a citizen of this State,* shall be admitted to probate under either of the preceding provisions, *unless such will shall have been executed according to the laws of the State or country in which the same was made.*" (§ 68, 69. *In the matter of Roberts' will,* 8 *Paige,* 446,) these provisions appear

to adopt the *lex loci actûs*, in the case of persons domiciled abroad: although as I have indicated elsewhere, they do not exclude the operation of the law of the domicil, except in the particular modes of probate recognized in these sections of the statute. (*Isham* vs. *Gibbons*, 1 *Bradford's R. p.* 77.) I think the fair construction of these provisions makes these sections applicable to persons residing abroad *at the time of the execution of the will;* and in such case recognizes the law of the place where the act was performed, as a proper criterion and guide in respect to the formality of the act—not as the only criterion, but as *one* which the law is willing to adopt in view of the special modes of probate prescribed in the statute. If that interpretation be reasonable and just, the policy of our law is sufficiently declared in this branch of the statute. In view then of the state of the continental law and of the *jus gentium*, in view of our own statute, as well in regard to revocations as to the recognition of the *lex loci actûs* just stated; in view of the fact that the will in question was made conformably to the law of the place where the decedent was domiciled at the date of its execution; and in the absence of any authoritative ruling on the precise point involved, I conclude in favor of the validity of this instrument as a will of personal estate, and must direct sentence of probate accordingly.